Steve CUPP,
Plaintiff/Respondent/Cross–Appellant,

v.

**NATIONAL RAILROAD PASSENGER CORPORATION, Defendant/Appellant,**

and

**The Mart Corporation,
Defendant/Respondent/Cross–
Respondent.**

**Nos. ED 82635, ED 82646.**

Missouri Court of Appeals,
Eastern District,
Division Two.

July 6, 2004.

Thomas E. Schwartz, Holloran & Stewart, P.C., St. Louis, MO, for plaintiff/respondent/cross-appellant.

Michael B. Hunter, Lisa A. Larkin, Williams Venker & Sanders LLC, St. Louis, MO, for appellant.

James E. Godfrey, Jr., Godfrey & Associates, St. Louis, MO, for defendant/respondent/cross-respondent.

KATHIANNE KNAUP CRANE, Judge.

Plaintiff, a railroad employee, was injured when he attempted to stop a locomotive wheel set that suddenly exited a newly installed wheel wash and rolled towards a fellow employee. He brought a FELA action against the railroad and a negligence action against the seller of the wheel wash, whose employees had been working on the wheel wash at the time of plaintiff's accident. The railroad filed a contribution action against the seller. The trial court granted the seller's motion for directed verdict with respect to both the negligence and the contribution actions, and submitted the FELA action to the jury, which returned a $200,000 verdict against the railroad. After a reduction for an offset, the trial court entered judgment against the railroad in the amount of $197,500.

Plaintiff and the railroad appeal. They each claim that the trial court erred in entering a directed verdict in the seller's favor. In addition, the railroad asserts that the trial court erred 1) in denying its motion for judgment notwithstanding the verdict on the basis of instructional error and 2) in denying its motion for new trial for the reason that prejudicial evidence was admitted. We reverse that part of the judgment granting a directed verdict in the seller's favor and remand for a new trial. We affirm the judgment against the railroad.

## FACTUAL AND PROCEDURAL BACKGROUND

In accord with our standard of review when a motion for directed verdict has been granted in a defendant's favor, we recite the facts in the light most favorable to plaintiff and the railroad. In October, 2000, plaintiff, Steve Cupp, was an employee of National Railroad Passenger Corp. ("Amtrak") in the wheel shop at its Beech Grove, Indiana, facility. He had worked as a railroad machinist for Amtrak since 1986. Defendant, The Mart Corporation ("Mart") was a designer and manufacturer of custom automated parts washing systems. Amtrak had purchased a wheel wash from Mart, which had been delivered to Amtrak in approximately December, 1999.

A wheel wash washes locomotive wheels one set at a time. An exit door opens automatically when it finishes washing the wheel set, and the wheel set rolls out of the machine onto a cradle on a slight downhill grade and then onto a set of rails embedded in the shop floor. The wheel sets were supposed to stop at the end of the rails after exiting the wheel wash. Amtrak designed, built, and installed a mechanism known as a retarder, to control the speed at which the wheels exited the wheel wash.

On October 25, 2000, two Mart employees, Jack Conley, a field service technician, and Michael Erlson, project engineer, went to the Amtrak facility at Beech Grove, Indiana, arriving at noon, to service and adjust the wheel wash. At that time, the new wheel wash was still being set up and was not yet operational. The retarders had not started working, because they could not be properly adjusted until the machine was ready for wheel sets to be run through. Before Amtrak could run wheel sets through the wheel wash, the Mart employees would have to get "everything to work in sequence," and Amtrak personnel expected Mart to test run wheel sets through the wheel wash before Amtrak started using it.

On the evening of October 25, the Mart employees ran wheel sets through the

wash. No Amtrak employees were working on the machine itself. The two Mart employees made adjustments to increase the speed at which the wheels were exiting the wheel wash because they were not coming off the cradle with sufficient speed to reach the rails embedded in the concrete floor.

John McCutcheon, an Amtrak employee, observed several sets of wheels come out of the wheel wash that evening and told the Mart employees that it was dangerous to eject wheels while people were working in the area. The Mart employees told Mr. McCutcheon that the retarders were not working. Mr. McCutcheon stepped on them himself and verified they were not working. On his report that day, Russell Cross, an Amtrak supervisor, noted that the wheels were exiting the wheel wash quickly and recommended adjusting the retarder and installing a signal device.

The next afternoon, October 26, 2000, the Mart employees were still working on the wheel wash. No Amtrak employees were involved in running the wheel wash. Amtrak supervisor Willie Spears had assigned Amtrak employee Dwayne Willis to bring the wheels to the wheel wash with a forklift so the Mart employees could run them through. Mr. Willis put a wheel set in the wash and then parked the forklift at the end of the track to wait for the wheels. The wheel set quickly exited the wheel wash and struck the forklift, causing the forklift to move eight inches to a foot when it was struck. The Mart employees were in the area when the wheels hit the forklift.

Plaintiff and other Amtrak employees on the 3:00 p.m. shift had reported to a crew meeting at a picnic table, directly east of the wheel wash, and witnessed the impact with the forklift. One employee called back to the group that was still at the table, "Somebody going to get hurt." Mr.

Willis told his Amtrak supervisors, "Hey, you all need to do something about this machine. Because if these wheels come out like this, somebody's going to get hurt." He added, "You ought to shut it down."

After this incident, Mr. Willis's supervisor had him load wheel sets into the wheel wash two or three additional times and, on one or two more occasions, Mr. Willis parked the forklift at the end of the tracks, where it was again struck by the wheel sets. Meanwhile, plaintiff was in a second meeting in a different building. Plaintiff then returned to the wheel shop to work on the pull-off press. Mr. Willis loaded a wheel set in the wheel wash and then took the forklift outside to dump some scrap wheels. The next set of wheels came out and went down the rails, pushing away the wood chocks placed by Mart employees on the rails to stop the wheels from rolling off the end of the rail. Plaintiff heard a man yell, "Run away." He looked up and saw that his Amtrak supervisor, Mr. Spears, was in the path of the rolling wheel set that had just come out of the wheel wash. Plaintiff yelled to Mr. Spears, but Mr. Spears froze and did not move out of the way. Plaintiff grabbed the wheel set to stop it from striking Mr. Spears, injuring himself.

Plaintiff filed a petition in the Circuit Court of the City of St. Louis seeking damages from Amtrak pursuant to 45 U.S.C. section 51, the Federal Employers Liability Act (FELA), and damages from Mart for the negligence of its employees. Amtrak filed a cross-claim against Mart for contribution. The case was tried before a jury. Mart filed a motion for directed verdict at the close of plaintiff's case, on the grounds that Amtrak retained control of the premises and Mart owed no duty to plaintiff. The trial court granted the motion and entered a directed verdict in

Mart's favor. The jury returned a verdict in plaintiff's favor against Amtrak in the amount of $200,000. The court entered judgment in the amount of $197,500, after a reduction for an offset.

## DISCUSSION

### I. Directed Verdict

Plaintiff and Amtrak each assert that the trial court erred in sustaining Mart's motion for directed verdict on plaintiff's petition and Amtrak's cross-claim. Plaintiff sought damages from Mart for its employees' negligence in allowing the wheel set to suddenly exit the wheel washer and failing to warn those working in the area. Amtrak sought contribution from Mart to the extent of any judgment against it for Mart's employees' negligence in the operation of the wheel wash and failure to warn those working in the area. Neither plaintiff nor Amtrak alleged that Mart was liable based on an employment relationship or control of the premises.

Mart moved for a directed verdict on the grounds that plaintiff was an Amtrak employee; Mart's employees were business invitees; Amtrak designed, furnished and maintained the wheel washing machine; Amtrak had control of the premises, of Mart's employees, and its own employees at the time of the accident; and no evidence demonstrated that Amtrak relinquished control of the premises or its employees to Mart. In its memorandum in support of its motion, Mart argued that these facts failed to show a relationship between plaintiff and Mart that was actionable. Plaintiff and Amtrak filed memoranda opposing the motion. The trial court granted the motion on the stated grounds that Amtrak had not relinquished control of the premises, that Amtrak could not and did not escape its duty of providing a safe workplace, and Mart owed no duty to plaintiff.

■ We review the entry of a directed verdict in a defendant's favor to determine if the plaintiff made a submissible case. *Rustici v. Weidemeyer,* 673 S.W.2d 762, 765 (Mo. banc 1984). We view the evidence and reasonable inferences in the light most favorable to the plaintiff, and we disregard the contrary evidence and inferences. *Cabinet Distributors. Inc. v. Redmond,* 965 S.W.2d 309, 312 (Mo.App.1998). "We will reverse a verdict directed against a plaintiff unless the facts and inferences weigh so strongly against the plaintiff that there is no room for reasonable minds to differ." *Id.*

■ In "'any action for negligence, the plaintiff must establish that the defendant had a duty to protect the plaintiff from injury, the defendant failed to perform that duty, and defendant's failure proximately caused injury to the plaintiff.'" *L.A.C. v. Ward Parkway Shopping Center Co.,* 75 S.W.3d 247, 257 (Mo. banc 2002) (quoting *Lopez v. Three Rivers Electric Cooperative, Inc.,* 26 S.W.3d 151, 155 (Mo. banc 2000)). The existence of a duty is a question of law. *Id.*

A legal duty owed by one to another may arise from at least three sources: (1) it may be proscribed by the legislative branch; (2) it may arise because the law imposes a duty based on the relationship between the parties or because under a particular set of circumstances an actor must exercise due care to avoid foreseeable injury; or (3) it may arise because a party has assumed a duty by contract (agreement) whether written or oral. *Scheibel v. Hillis,* 531 S.W.2d 285 (Mo. banc 1976).

*Lumbermens Mut. Cas. Co. v. Thornton,* 92 S.W.3d 259, 263 (Mo.App.2002).

Mart bases its claim that the evidence failed to establish a duty running from it to plaintiff on the lack of an actionable

relationship between it and plaintiff. In its argument Mart identifies certain special relationships, that of employer-employee and landowner-invitee, that give rise to a duty of care with regard to risks that arise within the scope of that relationship. It then explains why, as a matter of law, it does not have a special relationship with plaintiff: because its employees are not employees of the landowner merely because they work in the landowner's building, citing *Lott v. Anheuser–Busch, Inc.,* 481 S.W.2d 517, 521 (Mo.App.1972); because a landowner who has not relinquished control of the premises to an independent contractor during a period of construction owes a duty of care to an invitee, citing *Noble v. Bartin,* 908 S.W.2d 390, 391 (Mo.App.1995); because an architectural firm not engaged to establish specifications for a trench or to supervise construction has no duty to a construction worker killed by a trench collapse, citing *McAninch v. Robinson,* 942 S.W.2d 452 (Mo.App.1997); and because an employer cannot escape its duty to provide a safe place to work by delegating the task to someone else, citing *Gunnett v. Girardier Bldg. and Realty Co.,* 70 S.W.3d 632, 638 (Mo.App.2002).

Mart concludes from the fact that it has no special relationship with plaintiff that it owed no duty to plaintiff. This conclusion is erroneous. In its argument, Mart established only that it owed no duty to plaintiff arising out of a special relationship. It did not establish that it owed no duty under traditional principles of negligence when no special relationship exists. " 'A duty of care arises out of circumstances in which there is a foreseeable likelihood that particular acts or omissions will cause harm or injury.' " *L.A.C.,* 75 S.W.3d at 257; *Madden v. C & K Barbecue Carryout, Inc.,* 758 S.W.2d 59, 62 (Mo. banc 1988). The duty is measured by whether a reasonably prudent person would have anticipated danger and provided against it. *Id.* The fact that plaintiff was an Amtrak employee working on premises controlled by Amtrak does not preclude plaintiff from bringing an action against a negligent third party, who, under the circumstances, was required to exercise due care to avoid foreseeable injury. *See Gunnett,* 70 S.W.3d at 636 (citing *Zueck v. Oppenheimer Gateway Properties,* 809 S.W.2d 384, 390 (Mo. banc 1991)). In this case, Mart's duty to Amtrak employees on Amtrak's premises arose out of the circumstances that it had control of the work its employees were performing on the wheel wash and control of the operation of the wheel wash and therefore was required to exercise due care in performing the work and operating the wheel wash to avoid foreseeable injury to the Amtrak employees in the area. In these circumstances Mart owed a duty of care to Amtrak's employees while its work was in progress, even though the premises remained in Amtrak's control during that time. *Miller v. Brunson Const. Co.,* 250 S.W.2d 958, 960 (Mo.1952); *Mino v. Porter Roofing Co., Inc.,* 785 S.W.2d 558, 561 (Mo.App.1990). "If the instrumentality causing the harm is under the control of the defendant contractor and the plaintiff is injured while in a work area common to employees, the defendant owes a duty of care to avoid causing such injury." *Mino,* 785 S.W.2d at 561 (citing *Howard v. S.C. Sacks, Inc.,* 76 S.W.2d 460, 465 (Mo.App. 1934)). The trial court erred in granting a directed verdict on the grounds that Mart had no duty to plaintiff because Amtrak had not relinquished its control of the premises and could not escape its duty to provide a safe workplace.

Although we may affirm the trial court if it is correct on any ground, not just on the grounds given, we do not go beyond the grounds asserted in the motion

and briefed on appeal to look for other reasons to affirm. *Thomas v. DeGrace,* 776 S.W.2d 500, 501 (Mo.App.1989). Mart did not assert any basis in its motion to support the direction of the verdict apart from the lack of a duty .based on these special relationships. Accordingly, point one is granted.

## II. *JNOV—Instructional Error*

For its second point Amtrak asserts that the trial court erred in submitting the FELA claim against Amtrak to the jury, without instructing the jury that it must find notice as an element of plaintiff's claim. Plaintiff's FELA claim against Amtrak was based on the dangerous operation of the wheel wash and the failure to install wheel stops. Amtrak contends that there was insufficient evidence that it had notice of the condition that plaintiff claimed caused his injury to justify taking the question of notice away from the jury.

Amtrak submitted its proposed instruction number 6, which was patterned on MAI 24.01 [1992 Revision] as modified by *Qualls v. St. Louis Southwestern Ry. Co.,* 799 S.W.2d 84 (Mo. banc 1990) [1]:

### INSTRUCTION NO. 6

Your verdict must be for plaintiff Steven Cupp and against defendant Amtrak if you believe:

First, conditions for work were not reasonably safe and defendant Amtrak knew or by using ordinary care could have known of such conditions and that they were not reasonably safe, and

Second, with respect to such conditions for work, defendant Amtrak ei-

ther failed to provide reasonably safe conditions for work, and

Third, defendant Amtrak thereby was negligent, and

Fourth, such negligence [sic] in whole or in part in injury to plaintiff Steven Cupp.

(LF 82)

The court rejected this instruction and gave plaintiff's Instruction No. 6 over Amtrak's objection. Plaintiff's Instruction No. 6 was based on MAI 24.01 [1992 Revision]:

### INSTRUCTION NO. 6

Your verdict must be for plaintiff Steven Cupp and against defendant Amtrak if you believe:

First, defendant Amtrak failed to provide reasonably safe conditions for work, and

Second, defendant Amtrak was thereby negligent, and

Third, such negligence resulted in whole or in part in injury to plaintiff.

Amtrak asserts that the trial court erred when it refused to modify the FELA verdict director patterned on MAI 24.01 [1992 Revision] by adding a paragraph that required the jury to find that Amtrak had knowledge or constructive knowledge of the unsafe condition. We disagree.

■ The Notes on Use under MAI 24.01 provide:

In the event plaintiff submits some act of negligence, constructive knowledge of which is not chargeable to the railroad, there shall be submitted in addition a paragraph providing "Second, conditions for work were not reasonably safe and defendant knew or by using ordinary

---

1. The form of instructions and the manner in which the substantive law is submitted to the jury in a FELA case is governed by state law.

*Duren v. Union Pacific R. Co.,* 980 S.W.2d 77, 79 (Mo.App.1998).

care could have known of such condition, and that they were not reasonably safe, and." This paragraph should be inserted between existing paragraphs First and Second and the remaining paragraphs should be renumbered accordingly.

(MAI at p. 372). "Implicit in the Notes on Use explanation as to when the additional paragraph should be used is the idea that the judge must decide whether the plaintiff has presented sufficient evidence to justify not submitting the issue to the jury." *Qualls,* 799 S.W.2d at 87. "If the judge decides the plaintiff has shown defendant had actual knowledge of the negligently produced condition, the additional paragraph is not required." *Id.* (citing *Foltz v. Burlington Northern R. Co.,* 689 S.W.2d 710, 715 (Mo.App.1985)).

*Qualls* involved the employer's knowledge of the extent of the accumulation of ice and snow on a bridge over which the employee walked while attempting to rejoin his work crew. 799 S.W.2d at 86–87. The conflicting testimony on the existence of those conditions was sufficient to require submission of the employer's knowledge to the jury. *Id.* at 87.

In contrast, in *Foltz,* 689 S.W.2d at 715, a switchman injured his back while throwing a switch. The injured switchman testified that, before the day of the injury, he had reported difficulties in operating the switch to his foreman, and another employee testified that he also reported difficulty in operating the switch to his foreman. The court held this evidence was sufficient to show the employer's actual, or at least constructive, knowledge of the condition, and therefore MAI 24.01 did not need to be modified. *Id.* at 715–16.

In *Holley v. Missouri Pacific R. Co.,* 867 S.W.2d 610 (Mo.App.1993) (overruled on other grounds by *Kauzlarich v. Santa Fe Ry. Co.,* 910 S.W.2d 254, 260 (Mo. banc 1995)), we reviewed *Qualls* and *Foltz* to ascertain the circumstances in which MAI 24.01 would and would not require modification. *Id.* at 616–17. In *Holley,* we found that, when the evidence showed that the conditions *leading* to the injury were known to the employer and were not of recent origin, this was evidence of actual or constructive knowledge "of the conditions which led to plaintiff's injury," and the refusal to modify MAI 24.01 was not error.

In this case there was sufficient evidence that Amtrak, through its employees, had actual or constructive knowledge of the conditions that led to plaintiff's injury. Amtrak argues that there was no evidence that it knew that Mart employees were going to run another set of wheels through the washer after the forklift left the area. This argument has no merit.

It is required only that Amtrak have knowledge of the existence of an unsafe condition leading to the injury. The unsafe condition was alleged to be the speed at which the wheel sets exited the wheel wash when the retarders were not operational and there were no effective wheel stops in an area where Amtrak employees were working. On the night before the accident, when the wheel sets were first being sent through the wheel wash, an Amtrak supervisor reported on the speed at which the wheel sets were exiting the wheel wash and the failure of the retarders. After the collision with the forklift earlier on the day of the accident, several Amtrak employees warned their supervisors and each other of the danger to employees working in the area. In addition, there was evidence that Amtrak personnel expected that the Mart employees would be repeatedly running wheel sets through the wheel wash as they made adjustments. Further, there was evidence that Amtrak personnel were aware that the Mart em-

ployees were repeatedly running wheel sets through the wheel wash and that there were continued problems with speed and the failure of the retarders. Finally, there was evidence that the Amtrak forklift driver, who was under the direction of his Amtrak supervisor, loaded the wheel set that injured plaintiff in the wheel wash, and then left the area to do other work. Plaintiff adduced sufficient evidence of Amtrak's knowledge of the unsafe condition to justify not submitting Amtrak's knowledge of the unsafe condition to the jury. The trial court did not err in refusing to modify MAI 24.01. Point two is denied.

III. *Motion for New Trial—Admission of Evidence*

For its third point Amtrak asserts that the trial court erred in admitting documents containing Amtrak's post-accident investigation because these contained inadmissible evidence of subsequent remedial measures and self-critical analysis. In its argument, Amtrak identifies the October 27, 2000, portion of Mr. Cross's wheel shop notes and the Amtrak Investigation Committee Report as the documents it claims should not have been admitted.

Mr. Cross kept daily running typewritten notes of wheel shop progress. Exhibits 10(a) and 10(b) contained his notes from Monday, October 23, 2000, through Friday, October 27, 2000. Amtrak complains of the admission of the October 27, 2000 entry recounting a post-accident safety meeting with other Amtrak personnel in which the following corrections were suggested:

• Install a handrail along the wheel runway with a section of chain that can be removed to allow access through the middle.

• Installing a stop at the end of the rail under the demount crane to stop wheelsets from going off the end of the rail.

• Adjusting the retarder to slow the wheels.

• Installing a warning device, probably a horn, to warn people when a wheel set is about to be released from the washer.

It also reported:

Maintenance adjusted the retarders and the wheelsets roll about half way to the axle area. I think we want to loosen the adjustment enough so that the wheelsets roll almost to the end.

Tom Gray is going to get the second shift maintenance to remove the alarm from the old wheelwasher in bu[ ]ilding 18 so we can install it on the new washer.

The Investigation Committee Report contains a description of the accident, identified the cause as the excessive speed of the wheel set and the adjustment of the retarders, identified contributing factors as "too much incline on exit rail of wheel wash and retarders not slowing wheel sets enough," and contained committee recommendations. The committee recommendations were: Install warning alarm system on machine just prior to wheels exiting. Adjust retarders to proper setting. "Install rail stops at the end of rails with guards to prevent tripping hazard." The last page, under the section marked "Equipment," the report contained the entry: "Retarders on exit track not strong enough to slow wheel sets."

■■■■■■ In FELA cases admissibility of evidence is a procedural matter that is governed by the law of the forum. *Keith v. Burlington Northern R. Co.*, 889 S.W.2d 911, 920 (Mo.App.1994). We review a trial court's decision on the admission of evidence only for abuse of discretion. *Brown v. Hamid*, 856 S.W.2d 51, 56 (Mo. banc 1993).

■■■■■■ Generally, evidence of subsequent remedial measures is inadmissible in negligence actions. *Pollard v. Ashby*, 793 S.W.2d 394, 401 (Mo.App.1990) (en banc)

(citing *Hefele v. National Super Markets, Inc.,* 748 S.W.2d 800, 803 (Mo.App.1988)). The admission of subsequent remedial measures to show negligence is prohibited for two reasons: First, if precautions taken could be used as evidence of previous improper conditions, no one, after an accident, would make improvements; and, second, subsequent changes are irrelevant to establish what the previous condition was. *Pollard,* 793 S.W.2d at 402. *See also Stinson v. E.I. DuPont De Nemours & Co.,* 904 S.W.2d 428, 432 (Mo.App.1995); *Brennan v. St. Louis Zoological Park,* 882 S.W.2d 271, 272 (Mo.App.1994). Because public policy favors remedial measures, evidence that, after an accident has occurred, a defendant took precautions to prevent a reoccurrence of the accident, or made changes or repairs in the property or place causing the accident, is not competent evidence to be used against the defendant to show antecedent negligence or an admission of negligence. *Diversified Metals Corp. v. Aaron Ferer & Sons, Inc.,* 498 S.W.2d 783, 786 (Mo.1973); *Stoeppelman v. Hays–Fendler Construction Co.,* 437 S.W.2d 143, 152 (Mo.App.1968).

 Plaintiff responds that the evidence in these exhibits did not constitute prohibited evidence of subsequent remedial measures because the evidence did no more than reiterate the existence of conditions that Amtrak was aware of prior to the accident and measures Amtrak had planned to take prior to the accident. We agree.

The problems identified and the remedial measures suggested in the two documents had been known and planned prior to the injury. Before the accident, Amtrak knew that the retarders were not working and that efforts to stop the wheels by other means were not satisfactory. Mr. Cross's notes from October 26, 2000, before he had notice of the incident that caused plaintiff's injury, show that Amtrak was aware prior to the accident that the wheels were coming out too fast and made plans to adjust the retarders and install a warning device. He reported:

- We need to have maintenance adjust the retarder to slow the wheels.
- We need to install a signal device to inform shop people that a wheel is about to be ejected from the washer.

There was also evidence that at the time of the accident the area had been barricaded to keep out pedestrian traffic. The problems and remedial measures identified in the post-accident reports were no different than those identified and proposed prior to the accident.

 The public policy rationale for excluding evidence of post-accident remedial measures does not apply if the measures in question were planned, provided for, or undertaken prior to that accident. The purpose of the exclusionary rule is to protect a defendant who has been first alerted to the possibility of danger after an accident and has been induced by the accident to make the repair to prevent further injury. A defendant who is aware of the problem and has proposed measures for remediation prior to the accident is not entitled to the same protection. *See Schmeck v. City of Shawnee,* 232 Kan. 11, 651 P.2d 585, 600 (1982) (new traffic control devices ordered prior to the accident could not be considered a subsequent remedial measure); *Raymond v. Raymond Corporation,* 938 F.2d 1518, 1523 (1st Cir. 1991) (product modifications on the drawing board, but not yet implemented at the time of the accident, did not constitute a subsequent remedial measure).

In this case there was evidence that Amtrak was aware of the conditions reported in the two exhibits prior to the accident and had tried or proposed the suggested measures prior to the accident. The fact that these conditions and measures were reported again in post-accident

documents or suggested again after the accident does not, in the context of this case, make them inadmissible subsequent remedial measures. *See Thornton v. National Railroad Passenger Corporation,* 802 So.2d 816, 820 (La.Ct.App.2001). In *Thornton,* the Louisiana Court of Appeals held that trial court did not abuse its discretion in admitting defendant railroad's post-accident investigation committee report and safety alert because the recommended measures were those the defendant had implemented before the accident in other facilities. In this case, there was no risk that the challenged evidence unfairly injected inadmissible matters into evidence. The trial court did not abuse its discretion in admitting these documents. Point three is denied.

*Conclusion*

That part of the judgment granting a directed verdict in Mart's favor is reversed and the claims against Mart are remanded for a new trial. The judgment against Amtrak is affirmed.

GLENN A. NORTON, P.J., and MARY K. HOFF, J., concur.