James T. DAOUKAS,
Respondent/Cross–
Appellant,

v.

THE CITY OF ST. LOUIS,
Cross–Respondent,

and

William Lacey, Appellant.

No. ED 87350.

Missouri Court of Appeals,
Eastern District,
Division Two.

March 6, 2007.

Application for Transfer to Supreme Court
Denied April 5, 2007.

Ronald E. Fox, Ronda F. Williams, St. Louis, MO, for Appellant.

Martin M. Green, Clayton, MO, for Respondent.

GEORGE W. DRAPER III, Presiding Judge.

William Lacey (hereinafter, "Lacey") appeals from the trial court's judgment after a jury entered a verdict in favor of James T. Daoukas (hereinafter, "Daoukas") on his negligence claim and assessed his damages at $4,000,000. The jury found Daoukas forty-nine percent at fault for his injuries and Lacey fifty-one percent at fault, resulting in a verdict against Lacey for $2,040,000. Lacey raises three points on appeal. Daoukas cross-appeals. We affirm in part, and reverse and remand in part.

This appeal arises out of an electrical accident that occurred at Lambert St.

Louis International Airport on July 3, 2003. As a result of this accident, Daoukas and his coworker, Patrick O'Brien (hereinafter, "O'Brien"), were seriously injured. Daoukas and O'Brien were employees of Sachs Electric (hereinafter, "Sachs") which was under contract with the City of St. Louis (hereinafter, "the City") to perform electrical work at the airport during 2003. Lacey is an electrician who is employed by the City and works at the airport.

On July 2, 2003, O'Brien and Daoukas met with the Sachs general foreman, Rodney Gonz (hereinafter, "Gonz"), at the airport. Gonz informed the men what their assignment would be that evening, where the equipment was located, and what it looked like. Gonz told them an airport electrician, Lacey, would meet them at the substation at 11:30 p.m. Gonz also stated Lacey would be responsible for determining whether to shut off both feeders simultaneously or one at a time. Further, Lacey would have control over switching, or de-energizing, the source of the power at the substation and at the transformer. Daoukas testified Gonz repeatedly instructed him and O'Brien at their meeting, "Don't touch the keys. Don't touch the handles. You do nothing with the power. It will all be taken care of by the airport electrician."

Later that evening, O'Brien and Daoukas met Lacey to perform the electrical work. The transformer room had two cabinets which contained two feeders, 3D and 3C. Both cabinets in the transformer room were equipped with a Kirk-key system (hereinafter, "interlock system") which is a safety mechanism used to prevent the cabinet doors from being opened simultaneously when a piece of equipment behind the doors is energized. A key is required to perform any work within the switch cabinets. The key could not be removed from the lock while one cabinet door was open.

Lacey initially de-energized feeder 3D at the substation by removing the fuses from the breaker to ensure the breaker could not be turned back on without his knowledge. Daoukas testified it was Sachs' policy to perform a "lockout tagout" procedure which would ensure no one accidentally re-energized the feeder, but they were unable to perform this procedure at the substation because of the way the equipment was configured. All three men returned to the transformer room and Daoukas and O'Brien completed their work on feeder 3D. Afterward, Lacey returned to the transformer room and shut the cabinet door to feeder 3D. The men returned to the substation where Lacey reinstalled the removed fuses and closed the door. This resulted in feeder 3D becoming re-energized.

Lacey followed the same procedure to de-energize feeder 3C at the substation as he did for feeder 3D. O'Brien asked Lacey if he could leave the breaker to feeder 3D off while he and Daoukas worked on feeder 3C, but neither O'Brien nor Daoukas heard Lacey's response.

Lacey returned to the transformer room to extract the key from the interlock system on feeder 3D, but it would not come out. Lacey closed the switch, shut the cabinet door, and was able to remove the key. This caused the lights to go out in the transformer room because feeder 3D was de-energized. Lacey then used the key to open the cabinet door to feeder 3C. O'Brien testified Lacey "fiddled with a lock" for a "couple of minutes, maybe a minute," but he did not know what Lacey did specifically to the lock. O'Brien and Daoukas stood behind Lacey and watched him "fiddle" with the key. They both testified they did not know what Lacey was

doing, and they did not ask him what he was doing.

Lacey admitted he dismantled the interlock system so that he could verify visually that both feeders were de-energized. Lacey testified he witnessed his airport supervisor dismantle the interlock system in the past. Lacey left the dismantled interlock system on the floor where Daoukas and O'Brien could see it. Lacey testified he assumed Daoukas and O'Brien knew the interlock system was dismantled and would know what to do in that instance. Lacey later stated, "If I had known that they didn't know what I was doing, I wouldn't have done it."

The cabinet door to 3C was open. Lacey removed the key from feeder 3C and returned to feeder 3D to re-energize 3D. The electricity was restored to feeder 3D and the lights came back on. Lacey left the transformer room at that time. Shortly thereafter, Daoukas and O'Brien proceeded to work on feeder 3C. Feeder 3C was still receiving an electrical current, and an explosion occurred, seriously injuring both men.

Daoukas filed suit against Lacey and the City for his injuries. Daoukas' second amended petition alleged three counts. Count I, captioned "Premises Liability," alleged a claim of negligence against the City. Count II, captioned simply "Negligence," explicitly states, "This Count does not raise any claim that the City exercised control over the premises, but instead arises out of the negligent acts and omissions of the City's employee, William Lacey." Count III, captioned "Recklessness," alleged Lacey knew or had reason to know that dismantling the interlock system created an unreasonable risk of bodily harm and Daoukas suffered substantial harm as a result.

The City filed a motion for summary judgment. The trial court granted the City's motion, however, the trial court's order exclusively discussed the premises liability claim. The trial court failed to address any of the allegations of the City's vicarious liability for Lacey's individual acts of negligence. After the trial court denied both a motion to dismiss and a motion for summary judgment in favor of Lacey, the case proceeded to trial against Lacey only on the remaining two counts of the second amended petition.

At trial, the testimony, as detailed above, also included expert testimony. Michael Wald (hereinafter, "Wald") testified as an expert on Daoukas' behalf. Wald opined, "The cause of the accident is the bypassing of that safety mechanism. If that safety mechanism had not been bypassed, this cabinet could not have been energized. This dangerous situation could not have occurred...." In other words, when Lacey dismantled the interlock system and rotated the handle, Wald believed Lacey created the hazard that caused Daoukas' injuries. Moreover, Michael Tebeau (hereinafter, "Tebeau"), Lacey's supervisor at the airport, testified he did not condone Lacey's dismantling of the interlock system. Further, Tebeau testified the accident would not have occurred had Lacey not dismantled the interlock system, stating, "As long as the transformer was energized without overriding the interlock, these people could not have been working in that cubicle."

It was uncontroverted that Lacey did not tell Daoukas or O'Brien how to perform any of their electrical repairs, how to test the feeders, and O'Brien had no impression that Lacey was his foreman or supervisor. Further, Lacey was not responsible for implementing Sachs' safety rules, which included testing all equipment prior to performing work. O'Brien testified if his test of feeder 3C had indicated it

was energized, he would not have proceeded with the work.

After hearing all of the evidence, a jury returned a verdict in favor of Daoukas on his negligence claim and assessed his damages at $4,000,000. The jury found Daoukas forty-nine percent at fault for his injuries and Lacey fifty-one percent at fault, resulting in a verdict against Lacey for $2,040,000. Lacey appeals; Daoukas cross-appeals.

In Lacey's first point on appeal, he argues the trial court erred in denying his motion for judgment notwithstanding the verdict (JNOV). Lacey contends as a City employee, he was shielded by the independent contractor defense, and there was no evidence presented that he controlled the jobsite or the details and manner of work done by Daoukas.

█ Our standard of review of a denial of a JNOV is essentially the same as for review of denial of a motion for directed verdict. *Giddens v. Kansas City Southern Railway Co.*, 29 S.W.3d 813, 818 (Mo. banc 2000). A plaintiff makes a submissible case when each and every fact essential to liability is predicated upon legal and substantial evidence. *Dhyne v. State Farm Fire & Cas. Co.*, 188 S.W.3d 454, 456 (Mo. banc 2006). "In determining whether the evidence was sufficient to support the jury's verdict, the evidence is viewed in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict." Id. at 456–57. We will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion. Id.

Lacey's motion for JNOV alleged he was entitled to judgment as a matter of law for three reasons, all of which are now points on appeal. First, Lacey argues neither he

nor the City controlled the details of Daoukas' work. Therefore, as an employee acting within the course and scope of his employment, he did not owe Daoukas a duty of care and could not be held liable for negligence. Lacey's entire argument assumes this case was tried under a theory of premises liability and asserts a defense under the independent contractor exception. Thus, Lacey believes the question of liability in this case hinges not on whether Lacey used reasonable care in dismantling the interlock system, but whether Lacey controlled Daoukas' work activities. Daoukas disagrees, asserting the case against Lacey was tried under a theory of general negligence, and as such, the independent contractor defense would not apply.

█ "In any action for negligence, the plaintiff must establish that the defendant had a duty to protect the plaintiff from injury, the defendant failed to perform that duty, and defendant's failure proximately caused injury to the plaintiff." *Cupp v. National R.R. Passenger Corp.*, 138 S.W.3d 766, 771 (Mo.App. E.D.2004)(*quoting L.A.C. v. Ward Parkway Shopping Center Co.*, 75 S.W.3d 247, 257 (Mo. banc 2002)). We agree it is axiomatic that if the City does not owe Daoukas a duty of care under a premises liability theory of negligence, then Lacey, as the City's employee, likewise, does not owe such a duty. This absence of liability under one theory, however, does not preclude Lacey, and the City vicariously as Lacey's employer, from owing Daoukas a duty of care under a different theory of negligence. Such is the case as alleged in Counts II and III of Daoukas' petition, which were the issues that went to trial.

Our Court has addressed a similar issue in *Cupp*. In that case, a railroad employee filed suit alleging liability under the Fed-

eral Employers Liability Act against his employer railroad and a general negligence action against the seller of a wheel wash system, whose employees were working on the wheel wash at the time of the employee's accident. *Cupp*, 138 S.W.3d at 769. The trial court granted the seller's motion for directed verdict on the grounds that the railroad retained control of the premises, and the seller owed no duty to the employee because no special relationship existed. *Id.* at 770–71. The employee and railroad appealed. *Id.*

Our Court acknowledged that the employee failed to establish a special relationship existed between him and the seller which would establish a duty of care. *Id.* at 772. However, we disagreed with the seller's conclusion that the absence of a special relationship precluded any duty from arising. "[The seller] did not establish that it owed no duty under traditional principles of negligence when no special relationship exists." *Id.* Traditional principles of negligence dictate "[a] duty of care arises out of circumstances in which there is a foreseeable likelihood that particular acts or omissions will cause harm or injury." *Id.* (*quoting L.A.C.*, 75 S.W.3d at 257). Further, "[this] duty is measured by whether a reasonably prudent person would have anticipated danger and provided against it." *Id.* This Court stated that the employee working on premises controlled by his employer was not precluded from bringing suit "against a negligent third party who, under the circumstances, was required to exercise due care to avoid foreseeable injury." *Id.* Thus, we held the seller owed a duty of care to the employee while the seller's work was in progress, even though the premises remained under the railroad's control during the time of the injury. *Id.*

■ Likewise, we find Lacey owed Daoukas a duty of care despite the ab-sence of a special relationship or the independent contractor exception. Lacey's arguments that he did not control the jobsite, the manner of work, or the testing of the cabinets, focus solely on a premises liability theory of negligence. That theory of negligence was not at issue here. Daoukas alleged alternative theories of general negligence against Lacey and the City, which were the claims that were brought to trial. The sole claim of premises liability against the City was rejected by the trial court when it granted the City's motion for summary judgment.

■ Moreover, "[i]f the instrumentality causing the harm is under the control of the defendant contractor and the plaintiff is injured while in a work area common to employees, the defendant owes a duty of care to avoid causing such injury." *Cupp*, 138 S.W.3d at 772. At trial, Daoukas and O'Brien stated they were told not to touch the handles, keys, or anything related to opening up the cabinets. Lacey provided the sole access to the cabinet and was responsible for determining how to de-energize the cabinets. Further, Lacey admitted he affirmatively dismantled the interlock system. Under these circumstances, there was a foreseeable likelihood that dismantling the interlock system would cause harm or injury. Lacey's testimony that had he known Daoukas and O'Brien were unaware of what he was doing, he would not have dismantled the system indicates the foreseeability of that harm. This testimony also indicates that had Lacey acted as a reasonably prudent person would, he would have anticipated the danger and provided against it. Therefore, a duty of care arose between Lacey and Daoukas under traditional principles of negligence. As a result, the trial court did not err in denying Lacey's JNOV motion. Point denied.

In Lacey's second point, he argues the trial erred in denying his JNOV motion because the "something extra" exception applied to him in that he was not Daoukas' co-employee or supervisor. Lacey reiterates that he did not control the jobsite or the details and manner of work done by Daoukas. As we have discussed at length with respect to Point I, Lacey owed a duty of care to Daoukas regardless of whether he controlled the jobsite. This basic duty is not negated in the absence of a special relationship between Lacey and Daoukas. *See Cupp*, 138 S.W.3d at 772. Point denied.

In Lacey's final point on appeal, he contends the trial court erred in submitting Jury Instruction No. 5 to the jury, over his objection, in that the instruction erroneously presumed Lacey owed a duty to Daoukas. Lacey argues no duty existed as a matter of law, and as a result, the submission of the jury instruction was in error. As we have discussed with respect to Points I and II, Lacey owed a duty of care to Daoukas. As a result, the trial court did not err in submitting Jury Instruction No. 5 to the jury. Point denied. The judgment against Lacey is affirmed.

Daoukas cross appeals, alleging one point of error. Daoukas claims the trial court erred in granting summary judgment in favor of the City. Daoukas argues the City is vicariously liable for Lacey's negligence in that Lacey was a City employee and his negligent conduct occurred during the course and scope of his employment.

The record reflects Daoukas' second amended petition alleged general negligence claims against Lacey and against the City as Lacey's employer under a theory of respondeat superior. These allegations were not addressed in the trial court's order granting summary judgment in the City's favor prior to trial. The trial court's order focused solely on the premises liability claim brought by Daoukas in his second amended petition.

Under the doctrine of respondeat superior, an employer is held responsible for the misconduct of its employee if the employee's tortious acts are committed within the course and scope of his or her employment. *Davis v. Lambert–St. Louis Internat'l Airport*, 193 S.W.3d 760, 765 (Mo. banc 2006). The employer's liability attaches despite the absence of any negligence on the part of the employer. *Tuttle v. Muenks*, 964 S.W.2d 514, 517 (Mo.App. W.D.1998).

The evidence is undisputed that the City employed Lacey. Further, both Lacey and the City admitted Lacey dismantled the safety interlock system during the course and scope of his employment. Lacey owed a duty of care to Daoukas under traditional principles of negligence, which is separate from the premises liability claim asserted against the City. Therefore, the City should be held liable under the doctrine of respondeat superior for Lacey's negligent conduct which occurred within the course and scope of his employment.

Merely holding the City liable for Lacey's negligent conduct does not end our inquiry. Once an employer is determined to be vicariously liable for its employee's misconduct, "the liability of the employer can be no greater than the liability of the employee. This is because there is only one act of negligence that forms the basis of the plaintiff's injuries." *Helm v. Wismar*, 820 S.W.2d 495, 497 (Mo. banc 1991). Moreover, "[t]he plaintiff's damages are fixed by the employee's liability as well. Because the plaintiff's injuries do not result from the direct negligence of the employer, the employer is no more than an additional pocket from which the plaintiff can extract his judgment for the injuries caused by the employee's negligence." *Id.*

We must determine whether to enter judgment against the City pursuant to Rule 84.14 or remand this case for further proceedings. Daoukas asks this Court to enter judgment against the City rather than remand for a new trial. Lacey agrees, stating that if we hold the City liable, a new trial is not necessary because the amount of damages has already been determined. Lacey claims the only remaining issue to be resolved is the apportionment of fault between the City and Lacey for Lacey's negligence.

 The scope of remand should establish the apportionment of fault between Lacey and the City. The jury may then assess damages against the City, "but that assessment may not exceed the damages assessed at the first trial." *Helm,* 820 S.W.2d at 498. The jury's damage award in the first trial sets a cap on the City's damages for the second trial. *Id.* This rationale is explained in *Helm:*

> This is because the plaintiff has already fully litigated his damages for these injuries and collateral estoppel prevents relitigation of the damages issue. [The employer], which did not have an opportunity to defend in the first case, may offer its defense on remand. This is because collateral estoppel does not apply to [the employer]; it did not have a full and fair opportunity to defend itself in the first trial.

*Id.* at 498–99. Daoukas' point is granted.

The trial court's judgment is affirmed with respect to Lacey. The judgment is reversed and remanded for further proceedings consistent with this opinion as to the City.

GARY M. GAERTNER, SR. and ROBERT G. DOWD, JR., JJ., concur.