Christian D. BOGGS, By And Through
His Next Friend, Sheila Boggs,
Respondents,

v.

Eddie LAY, Archer–Daniels–
Midland, Appellants,

and

Dean Hinkle, et al., Defendants.

Nos. ED 83754, ED 83795.

Missouri Court of Appeals,
Eastern District,
Division Four.

March 8, 2005.

Motion for Rehearing and/or Transfer to
Supreme Court Denied April 27, 2005.

Application for Transfer Denied
June 21, 2005.

Susan F. Robertson, Columbia, MO, Douglas R. Richmond, Kansas City, MO, Patrick J. Kenny, St. Louis, MO, Michael L. Matula, Kansas City, MO, for appellants.

Ronald R. McMillin, Ann K. Covington, Rudolph L. Veit, Jefferson City, MO, Kenneth Lee Marshall, Webster Groves, MO, for respondents.

LAWRENCE E. MOONEY, Presiding Judge.

Chris Boggs left his home on his bike one afternoon to deliver newspapers. Chris rode down his driveway and out into the street between two stopped trucks and was hit by a tractor-trailer truck hauling soybean meal for the Archer–Daniels–Midland Company (ADM). At the time he was injured, Chris was thirteen years old and living with his grandmother on East Holt Street in Mexico, Missouri. Holt Street runs east-west through a residential neighborhood, with houses lining both sides of the street. At the west end of Holt Street, near Chris's home, is a soybean-processing facility, owned and operated by defendant ADM. The facility was built in the early 1950's. ADM has operated the facility since 1985.

ADM processes soybeans into a variety of products, including meal and oil, at the Holt Street facility. Trucks filled with soybeans enter the facility via Holt Street, are weighed "full" at a scale located near the entrance to the facility, and then proceed further into the facility grounds to dump the beans into a "bean dump." The trucks then return to the scale, are weighed again "empty," and then exit the facility via Holt Street. As to the meal generated at the Holt Street facility, ADM hires trucks—meal haulers—to pick up the meal from the facility and then deliver it to ADM's customers. The meal haulers enter the facility from Holt Street, are weighed "empty" at the scale, and then proceed further into the facility to be loaded with meal. The meal haulers then return to the scale, are weighed "full," and then exit the facility via Holt Street. The City of Mexico has designated Holt Street as the only lawful route for trucks to enter and leave the ADM facility.

Access onto the ADM scale is controlled by a red-green light located on both sides of an office building next to the scale. The light is manually controlled by ADM's scale operator, and is designed to direct trucks on and off of the scale. If there is a green light, the truck may enter the scale; if there is a red light, the truck may not

enter the scale. Historically, if unable to drive directly onto ADM's scale, the soybean truck drivers would queue up on Holt Street. The drivers typically would stop on the street, stay behind the wheel, perhaps setting their emergency brake, and wait until able to drive onto the scale and proceed with delivery of the soybeans. At other times, trucks would park on the street, and the drivers would exit their vehicles. . Holt Street, as a typical residential street, is not particularly wide, measuring only twenty-nine feet wide. A standard trailer truck is eight feet wide. The street is not wide enough for vehicles to be parked on both sides of the street and still allow for two lanes of travel. As one resident testified, to pass the queued trucks, one must drive down the middle of the street.

While trucks filled with soybeans waited on Holt Street for entrance to the ADM facility, certain other trucks did not wait in line typically the meal haulers. ADM had instructed the drivers of the meal trucks to pass the queued soybean trucks and to drive down the wrong side of the street in order to enter the ADM facility as a "first-priority" trucker.

Testimony from residents showed that, at times, there could be up to thirty trucks lined up, bumper-to-bumper, all the way down Holt Street. Truck traffic on Holt Street varies by the season and by the price of soybeans, with increased traffic seen during harvest time and when the price of soybeans rose. But as ADM's plant manager, Mr. Stumpe, acknowledged, there could be a backup on Holt Street at other times of the year. Trucks queuing up on Holt Street while waiting to deliver soybeans to the ADM facility was a long-standing problem that residents had complained to the police about for many years. Residents had complained that the trucks were noisy and would block drive-

ways along the street. Mr. Stumpe acknowledged that ADM knew of the residents' complaints. At the time of trial, there had been ongoing discussions for over ten years between ADM and the Mexico Department of Public Safety regarding the problem of trucks stacking up on the street and blocking driveways. Mr. Stumpe acknowledged that ADM was aware its facility was in a residential neighborhood with pedestrians, cyclists, and children. He also admitted that having trucks parked on the street was not "the most ideal situation," and that it could create a dangerous situation.

In the fall of 1992, nearly three years before Chris's injury, ADM bought a vacant piece of property directly adjacent to its facility. This property is commonly referred to as the "Mo–Con" lot. As Mr. Stumpe testified, one reason ADM purchased the Mo–Con lot was to ease the traffic congestion on Holt Street by using the lot as a parking lot where arriving truck drivers could queue up and wait until it was their turn to enter the scales. ADM also purchased the lot for storing equipment and for large maintenance activities.

When ADM first purchased the Mo–Con lot, it was in a state of disrepair and in no condition to be used as a parking lot for the trucks. The lot was muddy and overgrown with weeds and brush. ADM began clearing and repairing the lot in the summer of 1993, with the idea of having the lot ready for truck parking for harvest time in the fall. ·ADM used the parking lot for a few weeks during the fall of 1993, and then ruts began to develop and drainage problems appeared that necessitated a ditch being dug in 1994. In 1995, ADM began a project to install new processing equipment in its bean-prep building. ADM used the northwest corner of the Mo–Con lot to store the equipment for its project. Mr. Stumpe testified ADM tried

to keep the lot open during the project, but would close the lot when newly delivered equipment was being unloaded, or when cranes were being used to move equipment on the lot. The Mo–Con lot is a large area, and can accommodate up to 60 trucks.

On the day Chris was injured, September 15, 1995, three Hinkle Brothers' trucks were headed to ADM to deliver soybeans. Darrin Hinkle was driving the first truck, followed by Randy Nolke and Dean Hinkle, respectively. Darrin Hinkle testified that he knew the Mo–Con lot was there, but when he drove past the lot he saw that the gate was closed, and so proceeded further down Holt Street towards the ADM facility. When Darrin Hinkle approached the end of Holt Street he saw an outbound truck on ADM's scale, and the scale light was red. He stopped on Holt Street to wait for the red scale light to change to green. The driver of the second truck, Randy Nolke, stopped behind Darrin Hinkle's truck, just in front of a "No Parking" sign. He put his emergency brake on and waited for the green light so that he could move forward once Darrin Hinkle drove onto the scale. The back part of Nolke's truck was in front of the driveway to Chris's house. As Nolke's truck came to a stop, the third driver, Dean Hinkle, eased in behind Nolke's truck. There was approximately fifteen feet between the back of Nolke's truck and the front of Dean Hinkle's truck. Although Dean Hinkle pulled up far enough to clear the driveway behind his truck, he too also partially blocked Chris's driveway. Whether the Mo–Con lot was open on this date was disputed at trial. All the defendant truck drivers testified that the gate to the lot was shut.

In the meantime, Chris had arrived home from school and had folded the newspapers he was to deliver. He then got on his bike and saw that two trucks were stopped in front of his driveway. To his left, Dean Hinkle's truck blocked Chris's vision down the street. To his right, Randy Nolke's truck blocked his vision up the street. Chris rode out onto Holt Street in between Dean Hinkle's truck and Randy Nolke's truck, and collided with a tractor-trailer truck driven by Eddie Lay. Lay, a meal hauler headed towards ADM to pick up a load, was driving west in the eastbound lane of Holt Street, driving between a parked car on his left and the Hinkle and Nolke trucks on his right. When Lay had turned onto Holt Street and saw the line-up of trucks, he had decided to go past the stopped trucks, as ADM had told him to do. As he made his way past the stopped trucks, he suddenly felt the rear tandems of his truck pick up in the air and slam to the pavement. Lay had not seen Chris on his bike. Lay immediately stopped, exited his truck, and discovered Chris under the back tires of his truck.

Chris suffered serious and permanent injuries. Chris sustained head injuries, multiple fractures, internal injuries, and a crushed pelvis, among other injuries. He initially spent over three weeks in the hospital, and underwent multiple surgeries over the next several years. During the time Chris was in eighth and ninth grade, he was required to wear a catheter and a urine bag. Surgeries have enabled Chris to urinate normally. Chris no longer has a normally functioning left foot, and he has no sexual function.

Chris brought suit alleging negligence against ADM, Eddie Lay, and the drivers of the three parked trucks—Darrin Hinkle, Randy Nolke, and Dean Hinkle.[1] The

1. The plaintiff, Christian "Chris" Boggs, brought suit by and through his next friend,

jury returned a verdict in the plaintiff's favor, allocating fault as follows: defendant ADM—60%, defendant Eddie Lay—13%, defendant Darrin Hinkle—0%, defendant Randy Nolke—10%, and defendant Dean Hinkle—10%. The jury assessed the plaintiff's percentage of fault at 7%. The jury assessed the plaintiff's damages, disregarding plaintiff's fault, at $3,278,000. The trial court entered judgment against all defendants, except Darrin Hinkle, jointly and severally, in the amount of $3,048,540, representing the total damage award reduced by the plaintiff's fault. The court also found that the plaintiff had submitted certified demand letters to defendants ADM, Lay, and Dean Hinkle, and that the demand complied with the prejudgment-interest statute, Section 408.040 RSMo. Accordingly, the court ordered prejudgment interest against these three defendants, in the amount of $1,014,029.81, bringing the total judgment against these three defendants to $4,062,569.81, jointly and severally. Following trial, the plaintiff reached a compromise settlement with defendants Dean Hinkle and Randy Nolke in the amount of $700,000, paid in partial satisfaction of the judgment. Defendants ADM and Lay appealed separately. This Court consolidated the appeals.

## Discussion

ADM raises seven points on appeal, Lay three. ADM claims the plaintiff failed to make a submissible case on his negligence claim with respect to duty and proximate cause. ADM also alleges the trial court erred in submitting the verdict-directing instruction against ADM. Two of ADM's allegations of error concern the trial court's rulings regarding certain purported subsequent remedial measures. ADM's two remaining points on appeal, as well as Lay's three points on appeal, challenge the

trial court's award of prejudgment interest. We first address ADM's allegations of error.

For its first point on appeal, ADM alleges the trial court erred in denying ADM's motions for directed verdict and for judgment notwithstanding the verdict because the plaintiff failed to make a submissible case on his negligence claim against ADM with respect to the existence of any duty to the plaintiff on the part of ADM. In a second point on appeal, ADM alleges the trial court erred in denying ADM's motions for directed verdict and for judgment notwithstanding the verdict because the plaintiff did not make a submissible case with respect to proximate cause.

■ The standard of review of a trial court's denial of a motion for judgment notwithstanding the verdict is essentially the same as that for the denial of a motion for directed verdict. *Giddens v. Kansas City Southern Ry. Co.*, 29 S.W.3d 813, 818 (Mo. banc 2000); *Erdman v. Condaire, Inc.*, 97 S.W.3d 85, 88 (Mo.App. E.D.2002). We review to determine whether the plaintiff has made a submissible case. *Erdman*, 97 S.W.3d at 88. A directed verdict or judgment notwithstanding the verdict for a defendant is appropriate if the plaintiff fails to make a submissible case. *Crawford ex rel. Crawford v. Shop 'N Save Warehouse Foods, Inc.*, 91 S.W.3d 646, 650 (Mo.App. E.D.2002). To make a submissible case, a plaintiff must present substantial evidence for every fact essential to liability. *Erdman*, 97 S.W.3d at 88 *citing Coggins v. Laclede Gas Co.*, 37 S.W.3d 335, 338 (Mo.App. E.D.2000). "Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of facts can reasonably decide a case." *Coggins*, 37 S.W.3d at 338. Whether evidence in a case is substantial

Sheila Boggs.

is a question of law. *Id* at 339. In determining whether a plaintiff has made a submissible case, we view the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the plaintiff. *Id.* We presume that plaintiff's evidence is true and disregard any of the defendant's evidence that does not support plaintiff's case. *Id.* If the denial of a directed verdict or judgment notwithstanding the verdict is based upon a conclusion of law, we review the trial court's decision *de novo. Trinity Lutheran Church v. Lipps*, 68 S.W.3d 552, 557 (Mo.App. E.D. 2001); *Ozark Employment Specialists, Inc. v. Beeman*, 80 S.W.3d 882, 889 (Mo. App. W.D.2002); *see also, Jungerman v. City of Raytown*, 925 S.W.2d 202, 204 (Mo. banc 1996). A judgment notwithstanding the verdict is a drastic action, and should only be granted when reasonable persons could not differ on a correct disposition of the case. *Coggins*, 37 S.W.3d at 339.

The plaintiff here brought a negligence action against ADM. To make a submissible case of negligence, a plaintiff must establish that the defendant had a duty to protect the plaintiff from injury, that the defendant failed to perform that duty, and that the defendant's failure proximately caused injury to the plaintiff. *Lopez v. Three Rivers Elec. Co-op., Inc.*, 26 S.W.3d 151, 155 (Mo. banc 2000). ADM first challenges the submissibility of the plaintiff's case with respect to duty. The plaintiff alleged that ADM had breached a duty to make Holt Street safe for use by members of the public. ADM contends it had no such duty because it had not made special use of Holt Street, nor had it created an artificial hazard on the street.

"'Duty' is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff." William L. Prosser, *Law of Torts* section 53 p. 324 (4th ed.1971). It is "an obli-

gation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another in light of the apparent risk." 65 C.J.S. *Negligence* § 33, p. 325 (2000); Prosser, *supra* p. 324; *see also Pierce v. Platte–Clay Elec. Co-op., Inc.*, 769 S.W.2d 769, 771 (Mo. banc 1989) *citing Hoover's Dairy, Inc., v. Mid–America Dairymen*, 700 S.W.2d 426, 431 (Mo. banc 1985) and W. Prosser and W. Keeton, *Prosser & Keeton on the Law of Torts*, section 30, p. 164 (5th ed.1984). As Prosser states:

> The existence of duty. In other words, whether, upon the facts in evidence, such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other—or, more simply, whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant.

*Strickland v. Taco Bell Corp.*, 849 S.W.2d 127, 131 (Mo.App. E.D.1993) *quoting* William L. Prosser, *Law of Torts*, section 36 (3d ed.1964).

Whether a duty exists is purely a question of law. *Lopez*, 26 S.W.3d at 155. A duty to exercise care may be imposed by a controlling statute or ordinance, assumed by contract, or imposed by common law under the circumstances of a given case. *Bowan ex rel. Bowan v. Express Medical Transporters, Inc.*, 135 S.W.3d 452, 457 (Mo.App. E.D.2004); 65 C.J.S. Negligence section 33. p. 325. "The judicial determination of the existence of duty rests on sound public policy." *Hosto v. Union Elec. Co.*, 51 S.W.3d 133, 139 (Mo.App. E.D.2001) *quoting Hoover's Dairy*, 700 S.W.2d at 431. Duty is simply an "expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." William L. Prosser, *Law of Torts* section 53, pp. 325–6 (4th

ed.1971). Any number of policy considerations may justify the imposition of duty in particular circumstances, including: the social consensus that the interest is worth protecting; the foreseeability of the injury and the degree of certainty that the plaintiff suffered injury; the moral blame society attaches to the defendant's conduct; the prevention of future harm; considerations of cost and the ability to spread the risk of loss; and the economic burden on the actor and the community. *Bowan,* 135 S.W.3d at 457 *citing Strickland,* 849 S.W.2d at 132 *(citing Hoover's Dairy,* 700 S.W.2d at 432).

▬▬ It is well settled that the duty to maintain a public road in a safe condition rests on the municipality, and not on the abutting property owner. *Caldwell v. McGahan,* 894 S.W.2d 237, 238 (Mo.App. E.D., 1995); *see also,* 40 C.J.S. *Highways* § 249 (1991); 39 Am.Jur.2d *Highways, Streets, and Bridges* § 365 (1968). This rule, however, is not absolute. An abutting owner will be held liable for injuries sustained by travelers lawfully using the road as a result of conditions that the owner has been instrumental in creating or maintaining. *Harris v. Woolworth,* 824 S.W.2d 31, 33 (Mo.App. E.D.1991) *citing* 25 Am.Jur., *Highways* § 365 and 40 C.J.S. *Highways* § 249. "A person who creates a dangerous condition on a public roadway is liable for the foreseeable injuries caused thereby." *Harris,* 824 S.W.2d at 33.

▬▬ Missouri courts recognize two exceptions to the general rule that an abutting property owner is under no duty to maintain a public road in a safe condition. Under the first, "special-use" exception, a duty will be imposed when an abutting property owner puts an obstruction on the public road which was not a part of the original construction in order to serve his own purposes, or, when the abutting owner has made use of the public road for some

other purpose than merely using it as a road, such as a driveway or a private walkway. *Caldwell,* 894 S.W.2d at 238–9; *see also, O'Connell v. Roper Elec. Co., Inc.,* 498 S.W.2d 847, 852 (Mo.App.1973)(holding that an abutting landowner had a duty to maintain that portion of the public roadway that it had fenced off and used as a private walkway for its employees). An abutting property owner who makes a special use of the road is under a duty to exercise reasonable care to maintain that part of the road put to his special use in a reasonably safe condition for use by the public. *O'Connell,* 498 S.W.2d at 852. Thus, the abutting owner will be liable where he uses the road for his own private benefit or convenience and fails to exercise reasonable care to prevent injury to persons lawfully using the way. *Id., citing* 63 C.J.S. *Municipal Corporations* § 861.

▬▬ In this case, we hold ADM did not have a duty under the special-use exception. ADM did not obstruct nor alter the original construction of Holt Street in any manner. ADM did not make use of Holt Street for some other purpose than merely using it as a road. At no time was Holt Street used as something other than a street. The fact that trucks parked on the street and the traffic backed up down the street does not change the use from a street into a private parking lot as the plaintiff suggests. *See O'Neil For and on Behalf of O'Neil v. ADM Growmark River Systems, Inc.,* 871 S.W.2d 54, 56 (Mo.App. E.D.1993). ADM did not use Holt Street for its own private benefit or convenience; it was not the exclusive user of Holt Street. Houses line Holt Street, and the residents used the street on a daily basis. Accordingly, the plaintiff did not make a submissible case with respect to duty under the special-use exception.

While we hold that ADM did not have a duty under the special-use exception, we do, however, hold that ADM did have a duty under the second exception to the general rule that an abutting property owner is under no duty to maintain the public road in a safe condition. Under this second exception, a duty is imposed on an abutting property owner when he artificially creates, through negligence or affirmative action, a condition on the public road which makes passage unsafe. *Caldwell*, 894 S.W.2d at 239. This dangerous condition must arise through the owner's affirmative actions and not his omissions. *Id.* When the abutting property owner creates a dangerous condition on the public road, the law will impose a duty of reasonable care to guard the public from injury. *Harris*, 824 S.W.2d at 33.

ADM asserts that the unavailability of ADM's lot and the resulting queuing of trucks on Holt Street is insufficient to satisfy the artificial-hazard exception. ADM relies on this Court's decision in *O'Neil* to support its argument that ADM had no duty in this case. In that case, the plaintiffs were the surviving relatives of a man who was killed when his tractor-trailer was struck by a train while he waited to enter and make a delivery to ADM Growmark's grain elevator. As in this case, there was only one means of ingress and egress to ADM Growmark's property. A rail crossing traversed the access road. And, as in this case, there were times when traffic would back up on the access road. The plaintiffs in *O'Neil* alleged, in part, that ADM Growmark owed a duty to the decedent to warn him of the dangers at the rail crossing and to take precautions to prevent injuries while making deliveries to the grain elevator because ADM Growmark had created a hazardous condition. This Court found no such duty because the only affirmative action by ADM Growmark was to open for the business of accepting grain deliveries. *O'Neil*, 871 S.W.2d at 56. We reaffirm that holding today that there is no liability simply for traffic generated by being open for business.

Here, however, we have much more. ADM's operation of the red-green light for access onto its scales, its closure of the Mo-Con parking lot, and its instructions that the first-priority meal haulers should pass the other, parked trucks, all affirmatively created a condition on Holt Street that made passage unsafe. Because the convergence of ADM's actions created a dangerous condition on Holt Street, we hold it had a duty to exercise ordinary care to guard the public from injury.

Public-policy considerations also support the imposition of a duty of care on ADM in this case. As stated earlier, one policy consideration the courts look to in determining whether a duty exists in a particular situation is the foreseeability of the injury. Missouri courts have consistently held that, in the absence of a particular relationship recognized by law to create a duty, the concept of foreseeability is paramount in determining whether a duty exists. *See, e.g., Lopez*, 26 S.W.3d at 156 *citing Hoover's Dairy*, 700 S.W.2d at 431–2. "Foreseeability for purposes of establishing whether a defendant's conduct created a duty to a plaintiff depends on whether the defendant should have foreseen a risk in a given set of circumstances." *Lopez*, 26 S.W.3d at 156 *citing Zuber v. Clarkson Const. Co.*, 363 Mo. 352, 251 S.W.2d 52, 55 (1952). For purposes of establishing whether a duty exists, foreseeability is established when a defendant is shown to have knowledge, actual or constructive, that there is some probability or likelihood of injury sufficiently serious that an ordinary person would take precautions to avoid it. *Pierce,*

18 ▮ ▮▮▮▮▮▮▮▮▮▮▮

769 S.W.2d at 776; *see also, Lopez,* 26 S.W.3d at 156; *Hosto,* 51 S.W.3d at 139.

The evidence in this case supports a finding that ADM should have foreseen that there existed some probability of sufficient moment that an injury could occur. ADM knew that it was operating a facility in a residential neighborhood. ADM also knew that there were pedestrians, cyclists, and children in the neighborhood. ADM certainly knew that trucks backed up down Holt Street while awaiting access to the ADM scales. ADM admitted that having trucks parked on the street was not "the most ideal situation," and that having trucks parked in the street could create a dangerous situation. Yet, ADM instructed the first-priority meal haulers to pass the parked trucks and drive down the wrong side of this narrow residential street in order to reach the ADM facility. We believe, on these facts, ADM knew, or should have known, of a risk of harm to residents on bicycles sufficiently probable to create a duty. Simply stated, in light of the apparent risk, the plaintiff in this case was entitled to protection.

Concluding, the plaintiff presented a submissible case for negligence on his theory that ADM created a dangerous condition on Holt Street and thus had a duty to make Holt Street safe for use by members of the public. Accordingly, the trial court did not err in denying ADM's motions for directed verdict and judgment notwithstanding the verdict. ADM's first point is denied.

ADM also challenges the submissibility of the plaintiff's negligence claim against ADM with respect to proximate cause. ADM contends no conduct by ADM was the proximate cause of the plaintiff's injuries. Specifically, ADM claims that truck drivers Nolke and Dean Hinkle's acts of illegally blocking the plaintiff's driveway

were the intervening, superseding causes of the plaintiff's injuries.

▮▮▮▮ Actionable negligence requires a causal connection between the conduct of the defendant and the resulting injury to the plaintiff. *Schaffer v. Bess,* 822 S.W.2d 871, 876 (Mo.App. E.D.1991). ADM correctly notes that the mere fact that injury follows negligence does not necessarily create liability; a plaintiff must show the negligence was the proximate cause of the injury. *Vintila v. Drassen,* 52 S.W.3d 28, 41 (Mo.App. S.D.2001). "Proximate cause occurs if the cause operates to produce a particular consequence without the intervention of an independent or superceding cause." *Vintila,* 52 S.W.3d at 41 *quoting Long v. Missouri Delta Med. Ctr.,* 33 S.W.3d 629, 637 (Mo.App.2000)(abrogated, in part, on other grounds by *State Bd. of Registration for Healing Arts v. McDonagh,* 123 S.W.3d 146 (Mo.2003)). The practical test of proximate cause is whether the defendant's negligence is "an efficient cause which sets in motion the chain of circumstances leading to the plaintiff's injuries or damages." *Buchholz v. Mosby–Year Book, Inc.,* 969 S.W.2d 860, 861 (Mo.App. E.D.1998) *quoting Schaffer,* 822 S.W.2d at 876. A defendant's negligence need not be the sole cause of the plaintiff's injury. *Schaffer,* 822 S.W.2d at 876. It is sufficient that the defendant's conduct be one of the efficient causes thereof, without which the injury would not have occurred. *Id.*

▮▮▮▮ If two or more persons are guilty of consecutive acts of negligence, closely related in time, there is a question of whether the initial act of negligence was a proximate cause of the injury or whether there was an efficient, intervening cause. *Buchholz,* 969 S.W.2d at 862 *citing Buck v. Union Elec. Co.,* 887 S.W.2d 430, 434 (Mo. App. E.D.1994)(*citing Krause v. U.S. Truck Co., Inc.,* 787 S.W.2d 708, 710 (Mo.

banc 1990)). Negligent conduct which "sets in motion a series of events leading to an injury can be interrupted by an intervening cause which so interrupts the chain of events as to become the responsible, direct, proximate, and immediate cause of the injury." *Vintila*, 52 S.W.3d at 41 *quoting Esmond v. Bituminous Cas. Corp.*, 23 S.W.3d 748, 753 (Mo.App. W.D.2000)(*quoting Tompkins v. Cervantes*, 917 S.W.2d 186, 190-1 (Mo.App.1996)). Such intervening conduct renders any prior negligence too remote to operate as the proximate cause. *Vintila*, 52 S.W.3d at 41 *citing Esmond*, 23 S.W.3d at 753; *Schaffer*, 822 S.W.2d at 877. In order for a third person's negligence to be an intervening cause insulating the original tortfeasor from liability for his negligence, the intervening negligent act must be of a "wholly independent, distinct, successive, unrelated character." *Jordan v. General Growth Development Corp.*, 675 S.W.2d 901, 903 (Mo.App. W.D.1984). "Conduct may not be considered an independent, intervening cause where such action is a foreseeable, natural product of the original negligence." *Plummer v. Dace*, 818 S.W.2d 317, 321 (Mo.App. E.D.1991) *quoting Jordan*, 675 S.W.2d at 903. "Negligent conduct ceases to be the proximate cause of an injury only when the intervening act constitutes such a new and independent cause that it interrupts, rather than contributes to, the chain of events set in motion by the original negligence." *Plummer*, 818 S.W.2d at 322.

■ ADM maintains that the truck drivers' acts of blocking the plaintiff's driveway were just such an intervening cause. We disagree. Here, ADM set in motion the chain of circumstances leading to the plaintiff's injuries. On the day of Chris's injury, ADM's Mo–Con lot was unavailable for the trucks to use as a parking lot. Further, ADM controlled access to its scales via a signal light, and had instructed the first-priority meal haulers to pass the parked soybean trucks and drive down the wrong side of Holt Street in order to enter the ADM facility. With the Mo–Con lot unavailable, trucks delivering soybeans were required to stop and line up on Holt Street as they awaited entry to ADM's scale. It was both foreseeable and natural that, when the trucks were required to stop on Holt Street, the trucks would block driveways along the street. This had been a long-standing problem that the residents of Holt Street had complained about for many years. ADM was aware of the resident's complaints. There had been ongoing discussions for over ten years between ADM and the Mexico Department of Public Safety regarding the problem of trucks lining up on the street and blocking driveways. The truck drivers' actions of blocking the plaintiff's driveway were not wholly independent and unrelated to ADM's conduct, but rather, flowed from ADM's actions. Further, the trucks not only blocked the plaintiff's driveway, but also restricted his vision up and down the street, and of meal hauler Lay who was driving down the wrong side of the street to pass the parked trucks, as he had been instructed to do by ADM. The truck drivers' actions of blocking the plaintiff's driveway did not interrupt the chain of events set in motion by ADM, but rather, instead, contributed to the events leading to the plaintiff's injuries. And thus, accordingly, the truck drivers' actions did not constitute an intervening cause so as to sever the causation between ADM's conduct and the plaintiff's injury. The trial court did not err in denying ADM's motions for directed verdict and judgment notwithstanding the verdict. ADM's point is denied.

For its next point on appeal, ADM alleges the trial court erred in submitting Instruction Number 15, the verdict director

against ADM.[2] ADM alleges the instruction erroneously assumed as true the disputed issue of whether ADM had control over Holt Street sufficient to give rise to any duty owing to plaintiff including the duty set out in the instruction to use care to made the street safe for use by members of the public.

■ Whether a jury was properly instructed is a question of law which this Court reviews *de novo. Harvey v. Washington,* 95 S.W.3d 93, 97 (Mo.banc 2003); *Hosto,* 51 S.W.3d at 142. The purpose of a verdict-directing instruction is to hypothesize propositions of fact to be found or rejected by the jury. *Lasky v. Union Elec. Co.,* 936 S.W.2d 797, 800 (Mo.banc 1997). A verdict-directing instruction must require the jury to find all the necessary elements of a plaintiff's case except for uncontroverted facts. *Cline v. William H. Friedman & Associates, Inc.,* 882 S.W.2d 754, 763 (Mo.App. E.D.1994). When a fact material to a plaintiff's case is conceded or undisputed, its inclusion under an approved jury instruction is not mandatory. *Sheehan v. Northwestern Mut. Life Ins. Co.,* 103 S.W.3d 121, 127 (Mo.App. E.D.2002). It is reversible error, however, for a verdict-directing instruction to assume a disputed fact. *Lasky,* 936 S.W.2d at 800; *Harvey,* 95 S.W.3d at 97. Which facts are ultimate facts must be determined on a case-by-case basis, and depends on the specific theory of negligence presented by the plaintiff. *Ostrander v.*

*O'Banion,* 152 S.W.3d 333, 336 (Mo.App. W.D.2004) *citing Stalcup v. Orthotic & Prosthetic Lab, Inc.,* 989 S.W.2d 654, 658 (Mo.App.1999).

■ ADM contends that the instruction impermissibly assumed the disputed fact of whether ADM had control over Holt Street. More specifically, ADM argues that, if its alleged control over Holt Street could have been the source of a duty on ADM's part, then the disputed question of whether ADM actually exercised control should have been submitted to the jury. ADM complains it was found liable without any finding by the jury that ADM controlled traffic on Holt Street. ADM's argument misses the mark. Plaintiff's theory in this case was that ADM had created a dangerous condition on Holt Street. The duty asserted in this case was not a duty that arose by virtue of control; rather, it was a duty that arose by virtue of a hazardous condition. The disputed issue here is whether ADM, by its actions, had created a hazardous condition, not whether ADM had control over Holt Street.

The verdict director in this case tracked the provisions of M.A.I. 22.09, the verdict-directing instruction for a dangerous condition created by an abutting landowner. The instruction here required the jury to find ADM had created a dangerous condition because its parking lot was not available for use by the trucks. ADM's other

**2.** Instruction No. 15 read as follows:

In your verdict you must assess a percentage of fault to defendant ADM whether or not plaintiff was partly at fault if you believe:

First, trucks waiting to enter ADM's property were stopped or parked along the street, and as a result the street was not reasonably safe for the public, and

Second, such condition was created by defendant ADM because its parking lot was not available for use by the trucks, and

Third, defendant ADM knew or by using ordinary care could have known that the condition would expose members of the public to an unreasonable risk of using the street, and

Fourth, defendant ADM failed to use ordinary care to make the street safe for use by members of the public, and

Fifth, such failure directly caused or combined with the acts of others to directly cause or to directly contribute to cause damage to plaintiff.

actions giving rise to a duty—its instructions to the meal haulers and its operation of the red-green light to control access onto its scale—were not disputed facts, and thus were not required to be hypothesized in the instruction. The verdict-directing instruction defined the plaintiff's theory of negligence for the jury and required the jury to find all the disputed elements of the plaintiff's case. The trial court did not err in submitting Instruction Number 15 to the jury. ADM's point is denied.

For its fourth point on appeal, ADM alleges the trial court erred in overruling ADM's objections and admitting evidence that, shortly after the plaintiff's injury, ADM kept the Mo–Con lot open more than before the injury and erected a sign instructing truck drivers to park on the lot. ADM argues this evidence constituted inadmissible evidence of subsequent remedial measures. We disagree.

■ Generally, evidence of subsequent remedial measures is inadmissible in negligence actions. *Cupp v. National Railroad Passenger Corp.*, 138 S.W.3d 766, 775 (Mo.App. E.D.2004). The admission of subsequent remedial measures to show negligence is prohibited for two reasons. "First, if precautions taken could be used as evidence of previous improper conditions, no one, after an accident, would make improvements." *Cupp*, 138 S.W.3d at 776 *citing Pollard v. Ashby*, 793 S.W.2d 394, 402 (Mo.App.1990), *Stinson v. E.I. DuPont De Nemours & Co.*, 904 S.W.2d 428, 432 (Mo.App.1995), and *Brennan v. St. Louis Zoological Park*, 882 S.W.2d 271, 272 (Mo.App.1994). And second, "subsequent changes are irrelevant to establish what the previous condition was." *Id.* "Because public policy favors remedial measures, evidence that, after an accident has occurred, a defendant took precautions to prevent a reoccurrence of the accident, or made changes or repairs in the property or place causing the accident, is not competent evidence to be used against the defendant to show antecedent negligence or an admission of negligence." *Cupp*, 138 S.W.3d at 776.

■ The public-policy rationale for excluding evidence of post-accident remedial measures does not apply, however, if the measures in question were planned, provided for, or undertaken prior to the accident. *Id.* "The purpose of the exclusionary rule is to protect a defendant who has been first alerted to the possibility of danger after an accident and has been induced by the accident to make the repair to prevent further injury." *Id.* "A defendant who is aware of the problem and has proposed measures for remediation prior to the accident is not entitled to the same protection." *Id.*

■ Such is the case here. The evidence in this case clearly shows that ADM was aware of the problem of the truck traffic on Holt Street prior to the plaintiff's injury. ADM operated a signal light to control access onto its scales, which resulted in trucks lining up down Holt Street as they awaited access onto the scale. ADM acknowledged it was possible to get a backup of trucks even outside harvest times. Discussions between ADM and the Mexico Department of Public Safety had been ongoing for many years regarding the line-up and parking of trucks on the street. Further, the evidence indicates that the plaintiff's injury did not first alert ADM to the possibility of danger. ADM was aware its facility was in a residential neighborhood that had pedestrian and bicycle traffic. ADM was aware that the large tractor-trailer trucks had to access its facility via the narrow residential street. ADM had instructed the meal haulers to drive down the wrong side of the road in order to pass the

parked trucks. As ADM plant manager Stumpe testified, having trucks parked on a neighborhood street was not "the most ideal situation." He also acknowledged that having trucks parked in a residential neighborhood could create a dangerous condition.

ADM had proposed measures for remediation prior to the plaintiff's injury. As Mr. Stumpe explained, ADM bought the Mo–Con lot in part to use the lot as a parking lot for the trucks, so as to ease the traffic congestion on Holt Street and alleviate the problems attendant with trucks parking on the street. ADM first opened up the Mo–Con lot for parking for a few weeks in the fall of 1993. And while there is evidence that problems with the lot appeared that necessitated certain repairs in 1994, there is evidence implying that the lot was open again prior to the plaintiff's injury in 1995. Mr. Stumpe testified that although they were using the Mo–Con lot for storage in conjunction with a construction project in 1995, ADM attempted to keep the lot open during the project. Further, there is some evidence implying that truck drivers knew prior to Chris's injury that there was a parking lot for them to use as they awaited access to the ADM facility.

The evidence here shows that this is not a situation where ADM was first alerted to the possibility of danger and had been induced by the plaintiff's injury to take remedial measures. ADM was aware that trucks stopping and queuing up on Holt Street was a problem. ADM had proposed and implemented measures, including the availability of the Mo–Con lot, prior to the plaintiff's injury. Under these circumstances, the public-policy rationale for excluding evidence of post-accident remedial measures does not apply, nor is ADM entitled to the protection afforded by the general rule prohibiting the admission of subsequent remedial measures. Moreover, the complained-of measures here are simply reflective of ADM's awareness of a problem and measures planned, and implemented, prior to Chris's injury. The fact that, after the injury, ADM reopened the lot and placed a sign does not, under the circumstances, make them inadmissible subsequent remedial measures.

■■■■ The trial court's ruling on admissibility of evidence is accorded substantial deference and will not be disturbed, absent a clear abuse of discretion. *Brown v. Hamid*, 856 S.W.2d 51, 56 (Mo. banc 1993). Further, we are not bound by either the trial court's reasons or the complaining party's objections to the admissibility of the evidence; if any ground exists, we will uphold the trial court's decision. *Bailey v. Cameron Mut. Ins. Co.*, 122 S.W.3d 599, 602 (Mo.App. E.D.2003); *see also Ousley v. Casada*, 985 S.W.2d 757, 758 (Mo. banc 1999). Because we find that the complained-of measures are not inadmissible subsequent remedial measures, the trial court did not err in admitting the complained-of evidence. ADM's fourth point on appeal is denied. Consequently, we also deny ADM's fifth point on appeal alleging that the trial court erred in refusing ADM's request for a limiting instruction regarding the use of this evidence.

We next address the allegations of error regarding the trial court's award of prejudgment interest. Defendant Lay raises three points on appeal, two of which coincide with ADM's remaining points on appeal. Lay first complains that there was ineffective service of the plaintiff's demand letter. Next, both Lay and ADM challenge the sufficiency of the plaintiff's demand letter. And lastly, Lay and ADM challenge the court's calculation of the amount of prejudgment interest. We address each allegation in turn.

For his first point on appeal, Lay alleges the trial court erred in entering judgment for prejudgment interest against him because of ineffective service of the plaintiff's prejudgment-interest demand letter. Lay argues the prejudgment-interest statute, section 408.040.2, requires service of the prejudgment-interest demand letter by certified mail, and that, in this case, service was not accomplished in compliance with the statute because the certified letter was not served on him, but rather was signed for by his minor son.

■ The issue raised in this point, as well as the other points on appeal dealing with prejudgment interest, is whether the trial court erred in applying section 408.040.2 to award prejudgment interest. This issue involved the interpretation of the statute and its application. Interpretation of a statute and whether a statute applies to a given set of facts are questions of law which this Court reviews *de novo*. *McKinney v. State Farm Mut. Ins.*, 123 S.W.3d 242, 245 (Mo.App. W.D.2003).

■ Prejudgment interest in a tort action is authorized under section 408.040.2. The statute allows a plaintiff to recover prejudgment interest if the plaintiff makes a demand for payment of a claim, or an offer of settlement, to the opposing party and any subsequent judgment in the case exceeds the amount specified in the demand or settlement offer. Section 408.040.2; *see also, Emery v. Wal–Mart Stores, Inc.*, 976 S.W.2d 439, 448 (Mo. banc 1998). The statute requires that the demand or settlement offer be made in writing, be sent by certified mail, and be left open for sixty days unless rejected earlier. Section 408.040.2; *Emery*, 976 S.W.2d at 449. If a prevailing plaintiff demonstrates compliance with the above, the plaintiff is entitled to prejudgment interest calculated from a date sixty days after the offer of settlement was made, or from the date the demand or offer is rejected without counter-offer, whichever is earlier. *Id.; see also, Emery*, 976 S.W.2d at 449.[3]

■ Lay complains the plaintiff did not properly and successfully effectuate service of the demand letter, as required by the statute. He argues the statutory requirement of certified mail necessarily must imply that the certified mail service be completed properly and in accordance with the applicable service rules; in this case, that the letter be served upon Lay himself. We disagree. When statutory language is clear, courts must give effect to the language as written. *Emery*, 976 S.W.2d at 449. "Courts are without authority to read into a statute a legislative intent contrary to the intent made evident by the plain language." *Id.* "The court should regard the statute as meaning what it says." *Id.* We may not add words by implication to a statute that is clear and unambiguous. *Id.* Section 408.040.2 is clear. The statute, by its plain language, merely requires that the demand letter be sent via certified mail. It is undisputed in

3. Section 408.040.2 reads as follows:

In tort actions, if a claimant has made a demand for payment of a claim or an offer of settlement of a claim, to the party, parties or their representatives and the amount of the judgment or order exceeds the demand for payment or offer of settlement, prejudgment interest, at the rate specified in subsection 1 of this section, shall be calculated from a date sixty days after the demand or offer was made, or from the date the demand or offer was rejected without counter offer, whichever is earlier. Any such demand or offer shall be made in writing and sent by certified mail and shall be left open for sixty days unless rejected earlier. Nothing contained herein shall limit the right of a claimant, in actions other than tort actions, to recover prejudgment interest as otherwise provided by law or contract.

this case that the plaintiff sent his demand letter via certified mail. Lay's first point is denied.

For his second point on appeal, Lay challenges the sufficiency of the plaintiff's demand letter. ADM raises the same issue in its sixth point on appeal. We address both points together. Lay and ADM (the defendants) contend the plaintiff's demand letter runs afoul of section 408.040 and is insufficient to give rise to the right to prejudgment interest because the plaintiff failed to make a demand that was sufficiently definite and certain in its terms, as required by statute.

▬ The plaintiff sent one demand letter, addressed to defendants ADM and Lay, as well as three other individuals. In pertinent part, the plaintiff's demand letter stated as follows:

> Pursuant to section 408.040, RSMo. (1994), please let this letter serve as a settlement demand in the sum of $1 million, jointly and severally, to resolve the personal injury action arising from this tragedy. This offer shall be left open for 60 days unless earlier rejected.

The defendants contend that the plaintiff's single, unapportioned demand directed to a group of unrelated individuals and entities, is not sufficiently definite and certain in its terms, and thus is insufficient as an offer. The defendants complain that the plaintiff's demand did not identify: (1) whether a single defendant could accept the offer without the others; (2) who would be released if only one of the defendants accepted the offer; (3) the amount that a single defendant would have to pay if he was the only one that accepted; (4) how much any one defendant would have to pay in order to be released; (5) the amount that each of the defendants would have to pay if more than one accepted the settlement offer; or (6) the amount, if any,

that the plaintiff was demanding from any particular defendant. In sum, the defendants complain that the demand should have been more individualized, and, that as it stands, the plaintiff's demand was incapable of acceptance. We disagree.

▬ To begin, we find nothing in the plain language of the statute that precludes a plaintiff from serving a single, unapportioned demand on multiple parties. Next, the demand required under section 408.040 must be definite in its terms. *Brown v. Donham*, 900 S.W.2d 630, 633 (Mo. banc 1995). For a demand to be sufficiently definite under the statute, the amount due must be readily ascertainable. *Id.* The demand must be capable of ascertainment in a certain dollars-and-cents amount. *Id.* We find the plaintiff's demand in this case met these requirements. The plaintiff's demand is clear; he demanded the sum of one million dollars, jointly and severally, to resolve his personal-injury action. The whole of the amount demanded was directed to each of the potential defendants. The liability that resulted was joint and several. It is the responsibility of a defendant who otherwise could be jointly and severally liable for an entire judgment to determine if others are willing to bear some of the costs of settling their joint and several liability to the plaintiff. Lay's second and ADM's sixth points are denied.

For his third, and last, point on appeal, Lay challenges the court's calculation of the amount of prejudgment interest due. ADM also raises the issue of whether the trial court properly calculated prejudgment interest in its seventh point on appeal. Again, we address both points together.

The jury in this case assessed damages at $3,278,000. The trial court entered judgment against all liable defendants,[4]

---

4. The jury found defendant Darrin Hinkle 0%     at fault.

jointly and severally, in the amount of $3,048,540, representing the total amount of damages as determined by the jury, reduced by the plaintiff's percentage of fault. The trial court then calculated the amount of prejudgment interest owed based on this judgment amount and ordered prejudgment interest against defendants Dean Hinkle, Eddie Lay, and ADM in the amount of $1,014,029.81.

The defendants raise several challenges to the court's order, and calculation, of prejudgment interest. Both defendants argue that, before calculating the amount of prejudgment interest owed, the trial court should have reduced the judgment by $700,000, the amount paid to the plaintiff after trial by defendants Hinkle and Nolke as partial satisfaction of the judgment. Lay additionally argues the trial court erred in entering judgment for any prejudgment interest against him. He argues no prejudgment-interest liability can attach to him because the apportioned amount of the judgment owed by him is less than the plaintiff's demand of one million dollars.

■ The defendants acknowledged at oral argument that their positions are substantially eroded by the recent opinions of *Bowan v. Express Medical Transporters Inc.*, 135 S.W.3d 452 (Mo.App. E.D. 2004) and *Werremeyer v. K.C. Auto Salvage Co.*, 134 S.W.3d 633 (Mo. banc 2004). We agree. As detailed in *Bowan*, the determination of prejudgment interest is a two-step process. *Bowan*, 135 S.W.3d at 464. First, the court must determine whether a plaintiff is entitled to prejudgment interest under section 408.040.2. *Id.* If the jury's verdict exceeds the settlement demand made pursuant to section 408.040.2, the court next determines what amount of prejudgment interest is required under the statute. *Id.* Although prejudgment interest is normally calculat-

ed on the entire amount of the judgment, public policy suggests credit should be given for payments made to plaintiffs prior to trial, so that plaintiffs do not, in effect, collect interest twice on the prior settlement. *Id.*

■ The plaintiff in this case was entitled to prejudgment interest under section 408.040.2, as the total amount of judgment, $3,048,540, exceeded the plaintiff's demand of one million dollars. And, we find the court did not err in calculating prejudgment interest on the entire amount of the judgment, rather than first reducing the judgment amount by the $700,000 plaintiff received from defendants Hinkle and Nolke as partial satisfaction of the judgment. Defendants Hinkle and Nolke's payment was paid to the plaintiff after the trial. Lastly, because Lay is jointly and severally liable for the entire amount of the judgment, his total liability exceeds the plaintiff's demand, and thus, the trial court did not err in entering judgment for prejudgment interest against him. *Werremeyer*, 134 S.W.3d at 636. Lay's third and ADM's seventh points on appeal are denied.

The judgment is affirmed.

MARY K. HOFF, J., and PATRICIA L. COHEN, J., concur.